[No. 7970.   Department Two.   September 25, 1909.]

ANTHONY WHITE, *Appellant*, v. SPOKANE & INLAND EMPIRE
RAILROAD COMPANY, *Respondent*, EDWIN H. SANDERSON
*et al., Defendants.*[1]

MASTER AND SERVANT—SAFE PLACE—FALL OF ROCK IN QUARRY—
EVIDENCE—SUFFICIENCY.  The owner of a quarry is not guilty of
negligence, rendering it liable to an employee who was injured by
the fall of rock from the side of a cliff, evidently jarred loose by a
blast at another place, where it appears that no work had been done
at that point for a month, that it had been reasonably inspected and
there was no appearance of danger from a fall of rock, and such
danger could only have been discovered by a very close inspection of
the wall (DUNBAR, J., dissenting).

Appeal from a judgment of the superior court for Spokane
county, Huneke, J., entered December 2, 1908, in favor of
the defendant, by direction of the court, upon withdrawing
the case from the jury, in an action for personal injuries sus-
tained by an employee in a stone quarry.   Affirmed.

*Poindexter & Moore*, for appellant.

*Graves, Kizer & Graves*, for respondent.

PARKER, J.—In this action the plaintiff seeks to recover
damages on account of personal injuries which he alleged
were caused by the negligence of the defendant while working
in its stone quarry.   The cause proceeded to trial before the
court and a jury, when, at the close of the evidence produced
by plaintiff, upon motion of defendant's attorneys, the court
discharged the jury from the consideration of the case and
entered judgment in defendant's favor as to the first cause
of action; from which order and judgment the plaintiff has
appealed to this court.   The cause was continued for trial
upon the second cause of action by consent, so we are not
concerned with the issues there involved.   The order and

[1]Reported in 103 Pac. 1119.

judgment of the superior court were rendered upon the ground that the evidence produced in behalf of plaintiff was not sufficient to warrant the submission to the jury of the question of negligence, and that the undisputed facts show that plaintiff's injuries resulted only from an accident for which the defendants were not responsible.

It appears from the evidence, all of which is brought here by a statement of facts, that appellant was employed by respondent as a foreman, and at the time of the accident causing his injuries he was overseeing the work of removing loose rock from the quarry. The quarry was located on the side of a steep hill, and by the excavation of the rock a level bench or floor had been created, open on one side, and with a perpendicular wall of rock some thirty-five feet high on the opposite side. Appellant's duties consisted only in overseeing and directing the loading of loose rock upon dump cars, after it had been blasted out and otherwise loosened by a gang of workmen under another foreman named Hoskins. Appellant had nothing to do with the blasting or breaking down of the rock. On September 27, 1907, while engaged in the quarry in discharge of his duties as foreman in directing the removal of the loose rock, the appellant sustained a broken leg and other injuries by a large fragment of rock falling from the face of the wall from a point about twenty-four feet above the floor of the quarry. The place from which it fell was difficult of access, and its loosened and dangerous condition was not observable from the floor of the quarry, where appellant and others were required to work. Appellant had never before known of rock falling from the face of the wall, and he had worked in and about the quarry about nine months. At the time this rock fell there was no apparent cause therefor, no blast had been set off, at or very near the place from which the rock fell, for about a month previous, though blasting had been going on in the quarry at other places frequently in the course of the work.

Hoskins, the foreman in charge of the blasting and break-

ing down of the rock, was a man of some twenty years' experience in work of that character. He testified in substance that, if rock did not fall at the time of a blast, it would not fall at all, though he gave it as his opinion that the last blast had jarred this rock loose. This last blast had been set off some time previous to the accident—just how long, was not very clear from the evidence—but appellant's attorneys in their brief placed the time at three-quarters of an hour before, which, in any event, is approximately correct. This blast was set off in the usual manner, and there was no evidence to indicate that it was different from or stronger than usual. It was set off at a point about twenty-four feet from the foot of the wall where the rock fell, and there was a seam separating the rock in which the blast was set off from the wall from which the rock fell. When a blast was about to be set off, of course, all the men left the quarry, and then after the discharge, it was Hoskins' duty to first go in and see that all was safe; when, upon an examination and being satisfied as to safety, he would call the men back to work, which was done upon this occasion in the usual manner. It was also Hoskins' duty to bar down loose rock, which he describes as follows:

"Mr. Poindexter: What do you call barring down, Mr. Hoskins? A. Taking down the loose rock, the rock that is not safe there. Q. How is that done there, what is it? A. Going in with a short bar or long bar, anything that a man can see, that is an experienced man, anything that he could see that would be liable to fall or jar down, why we barred it down, pull it down before it falls down. Q. Put a crowbar in and pry it out and let it fall? A. Yes, sir."

He testified that upon this occasion he thought it was reasonably safe. He did not make a close inspection of the wall from which the rock fell after the last blast, and his prior inspections are shown by his testimony as follows:

"Q. Now then, you had previously blasted over at this point where this rock came down? A. Oh, perhaps a month before. Q. Exactly. And left it? A. Yes, sir. Q. And

gone on with your blasting over there? A. Yes, sir. Q. And you and your men, and White and his men had been working in the quarry continually for something like a month? A. Yes, sir. Q. And you had examined that wall to see whether it was safe? A. Oh, I don't know as I would give it a very close examination. Q. Well, you gave it such an examination as was prompted by your instinct of your own safety? A. Yes, sir. Q. And the safety of the men entrusted to your care, hadn't you? A. Sure. Q. Sure? A. I was over it lots of times. Q. And you had pronounced it safe and gone on leaving it there? A. Yes, sir. Q. And it had held safe there for something like a month after the blast? A. Yes, sir."

As to the apparent safety of the wall, the appellant testified:

"Q. State whether or not you looked around to see if there were any loose rocks that might fall? A. Well, generally I looked, all that I could see around, of course protecting myself. Q. Did you look this morning? A. Yes, sir. Q. Did you see any rock that seemed to be about to fall? A. No, sir."

Hoskins also testifies as to its apparent safety as follows:

"Q. Was there anything peculiar to you about this rock as you saw it there? A. Not to the naked eye. Q. Well, in any way that you were able to observe it? A. No, sir. Q. Now, did it look any different from any other of the rocks that were seamed and cracked as shown by the photograph about the place? A. No, sir."

And as to how the possibility of this rock falling could have been discovered, is shown by Hoskins' testimony as follows:

"Mr. Poindexter: State whether or not by a careful inspection it could have been discovered that this rock was loose and about to fall or might fall. A. It could by a very careful inspection be seen that that rock was loose. Q. In what way would such an inspection be made? A. By sounding. Q. What? A. Sounding, with a bar. Q. What do you mean by sounding with a bar? A. By hitting with a bar you can tell whether a rock is loose or solid, unless it is too large, by touching with a bar or taking the hammer, it has got a hollow

43—54 WASH.

sound to it.  Q. What you mean to say is, to discover whether that rock is loose or any other rocks were loose, somebody would have to go along the whole face of that cliff from top to bottom and thump it with a bar?  A.  Yes, but you don't have to go that close, just throw that bar against the wall anywhere.  Q.  Exactly; I don't care how close you go, but anywhere.  What you mean though, is whether you go close or stand far off you take the bar and go along up or along the different places of that cliff.  A.  Yes, sir.  Q. That is what you call a very careful examination?  A. That is what I call a very careful examination."

The principal contention of learned counsel for appellant is that, had the foreman Hoskins, to whom that duty had been delegated, made a proper inspection, the unsafe condition of the place would have been discovered and the danger obviated, and that respondent, not having performed his duty through Hoskins in this respect, did not furnish appellant a reasonably safe place in which to work.  So the question is presented, what was respondent required to do more than was done by Hoskins, its foreman, in the way of inspection of the wall and the place from which the rock fell and injured appellant.

In Webb's Pollock on Torts (Enlarged American Edition), on page 42, the learned author says:

"The doctrine of 'natural and probable consequence'. is most clearly illustrated, however, in the law of negligence. For there the substance of the wrong itself is failure to act with due foresight; it has been defined as 'the omission to do something which a reasonable man, guided upon those considerations which ordinarily regulate the conduct of human affairs, would do, or doing something which a prudent and reasonable man would not do'.  Now a reasonable man can be guided only by a reasonable estimate of probabilities.  If men went about to guard themselves against every risk to themselves or others which might by ingenious conjecture be conceived as possible, human affairs could not be carried on at all.  The reasonable man, then, to whose ideal behavior we are to look as the standard of duty, will neither neglect what he can forecast as probable, nor waste his anxiety on

events that are barely possible. He will order his precaution by the measure of what appears likely in the known course of things. This being the standard, it follows that if in a particular case (not being within certain special and more stringent rules) the harm complained of is not such as a reasonable man in the defendant's place should have foreseen as likely to happen, there is no wrong and no liability."

In the recent case of *Southwestern Telegraph & Telephone Co. v. Tucker* (Tex.), 114 S. W. 790, we find a situation much like the one before us, involving the same principle so far as the duty of inspection or liability for unknown defects or dangers are concerned. In that case the plaintiff was sent to the top of a telephone pole when the pole fell injuring him, the fall being caused by its decayed condition under the surface of the ground, while above ground it appeared to be sound. Touching the defendant's duty as to inspection the court said:

"If there was any negligence on the part of the plaintiff in error in not having inspected the pole sufficiently to have discovered the defects, or if there had been anything to indicate that the pole was rotten under the ground, it would clearly have been the duty of the company, through its inspector, to have examined the pole, which would have resulted in the discovery of the defect. The evidence discloses, so far as was known, that there was no reason to suppose that the pole was rotten, for according to the testimony the pole had been standing only for six years. The rottenness of the pole having been concealed by the ground, we fail to see that there was anything in the testimony tending to show that the plaintiff in error ought to have discovered it. We know of no rule of law that imposes upon the master the duty of looking out for defects in objects with which the servants are working, where there is nothing to indicate that any such defect existed. To so hold would be to make the master the insurer of the safety of the servants absolutely. As we have said, poles of the same character usually last unimpaired for a period of 12 years. To all appearances it was entirely sound, and we cannot see that there was anything to indicate that it required any more inspection than was given to it by the injured party. The case narrows itself down to the question,

What would a man of ordinary prudence have done under the circumstances? There being nothing in regard to the pole to excite any suspicion as to its soundness, or anything to indicate that a further inspection was necessary in order to test its sufficiency, we do not see how it can be said that an ordinary prudent man would have taken any other steps in regard to it."

In the case of *Cully v. Northern Pac. R. Co.*, 35 Wash. 241, 77 Pac. 202, a nonsuit was sustained by this court where plaintiff was injured by a slide from the side of a gravel pit in which he was working, and which occurred in a similar unexpected manner as the falling of the rock in this case. Disposing of the plaintiff's contentions seeking to invoke the rule of reasonably safe place to work, this court, at page 247, said:

"Granting a nonsuit is the next error assigned. The appellant seeks to invoke the rule in this case that it is the duty of the master to furnish the servant with a safe place in which to work. This rule, however, has no application to this class of employment. As was said in *Kath v. Wisconsin Cent. R. Co.* (Wis.), 99 N. W., at page 221: 'The place to work is being changed constantly, and is necessarily incomplete and dangerous; and the employe knows it, and accepts such risks as are ordinarily present in such operations.' "

Now if the rule of reasonably safe place to work should be considered applicable here, the degree of care to be exercised by the master is, after all, only *reasonable care* and the furnishing of a *reasonably safe place* to work. The undisputed evidence makes it clear that there was no reason to suppose that any rock on the face of the wall was in such condition as to be at all likely to fall at such a time as it did fall. Both the appellant and Hoskins, his principal witness, saw no such indication. It had stood there for a month with blasting going on frequently in the quarry, and during all of this time it had remained apparently safe. And as to the care with which it was inspected, Hoskins says: "I was over it lots of times." And it is clear from his testimony that at the time of

the accident the dangerous condition could only have been discovered by a very careful inspection. It is clear that there was no apparent reason for making a very careful inspection.

In the case of *Wilson v. Northern Pac. R. Co.*, 31 Wash. 67, 74, 71 Pac. 713, referring to unknown and unsuspected dangers, the court used this language:

"When the danger is not known, and not suspected, and where there are no circumstances which would cause a reasonably careful man to investigate and ascertain the danger, the law will not impute knowledge of danger where the knowledge is not shown in fact."

We are of the opinion that the undisputed evidence in this record shows that there was no negligence such as in law would render the respondent liable in damages for appellant's injuries. We therefore conclude that the disposition of the cause by the trial court was proper, and its judgment is affirmed.

MOUNT and CROW, JJ., concur.

DUNBAR, J. (dissenting)—I dissent. It is conceded that the duty of inspection devolved upon Hoskins, the foreman in charge of the blasting and breaking down of the rock. The appellant necessarily could not be charged with such duty under the rule that, in the absence of apparent danger, he had a right to rely upon the master to furnish him a safe place to work. In this case I am convinced that Hoskins relied upon the fact that there was no apparent danger; but the master's duty does not end here, else he would be placed on the same footing with the servant. The testimony of the respondent reveals the fact that, if Hoskins had made the inspection which he should have made, and which he testified it was easy to make, the hidden danger would have become apparent. The fall of the rock was not the result of an accident; it was concededly the result of a blast; and if the inspection had been commensurate with the danger necessarily in-

cident to such work, the condition would have been discovered and the injury averted. In any event, the question of the sufficiency of the evidence was a question for the determination of the jury. I do not think the cases cited from this jurisdiction are controlling.